## CHARLESTON.

### RAINES *v.* CHESAPEAKE & O. R'Y CO.

Submitted January 23, 1894—Decided March 21, 1894.

1. RAILROAD COMPANIES—NEGLIGENCE.
Each case must depend upon its own facts in determining what shall constitute ordinary care or reasonable prudence in the running of a railroad train.

2. RAILROAD COMPANIES—NEGLIGENCE.
When a given state of facts is such, that reasonable men may differ upon the question, whether there was negligence or not, the determination of the matter is for the jury.

3. RAILROAD COMPANIES—NEGLIGENCE.
But, when the facts are such that all reasonable men must draw from them the same conclusion—when there is no room for two reasonable opinions about it—then it becomes a question of law for the court.

4. RAILROAD COMPANIES—NEGLIGENCE.
If any apparently capable person, and one apparently in the

possession of his faculties, is seen walking on a railroad track, the servants of the company running the train having given such signals, as are required, have a right to act on the presumption, that such person will step aside in time to remove himself from danger.

5. RAILROAD COMPANIES—NEGLIGENCE.

If those running a railroad train discover a trespasser in imminent danger on the track, they must use all reasonable exertions to avoid inflicting injury ; otherwise, the company will be responsible.

6. RAILROAD COMPANIES—NEGLIGENCE.

But, if they omit no duty after becoming aware of his danger, the railroad company will not be responsible for such injury.

E. W. WILSON for plaintiff in error :

I.—*On a motion to strike out all the evidence, the court should consider the evidence which is asked to be excluded with all favor, and draw therefrom all the inferences it would be entitled to, if the party making the motion to exclude had demurred to the evidence.*—30 W. Va. 228.

II.—*A motion by defendant to exclude the plaintiff's evidence, upon the ground that it is not sufficient to warrant· a verdict in his favor, will not be granted, if there be any evidence, which tends, in any degree, however slight, to prove the plaintiff's case. If it tend to prove the plaintiff's case in any degree whatever, the case can not be withdrawn from the jury. The motion can never prevail or be sustained merely because the court may think the weight of evidence is against the plaintiff.*—35 W. Va. 389; 36 W. Va. (14 S. E. Rep. 465). 139 U. S. 551 (L. Ed. 35, 270).

III.—*The fact that pedestrains are accustomed to travel on a railroad at a particular place, makes it the duty of such railway company to exercise greater caution and prudence in the operation of its road at that place.*—30 W. Va. 228.

IV.—*Although plaintiff's intestate was guilty of negligence in using defendant's railroad track as a foot-path for his own convenience, elsewhere than at a lawful crossing, and received the fatal injuries complained of, while so doing, yet if said injuries could, and would, have been avoided but for the gross, or wanton, negligence of defendant, then the defendant is, nevertheless, liable.*—34 W. Va. 514, 517, 519; 35 W. Va. 117; Patt. R'y Acc. Law, 51 *et seq.*

V.—*Although plaintiff s intestate may have been guilty of negligence, and although that negligence may have contributed to the fatal injuries complained of, yet, if after having notice of the dangerous exposure of deceased, the defendant did not exercise ordinary care and diligence to prevent the injury, but for which the injury would not have occurred, the defendant is liable.*—10 M. & W. 546 ; 31 Gratt. 812 ; 78 Va. 664 ; 80 Va. 346 ; 82 Va. 335 ; 28 W. Va. 732 ; 35 W. Va. 389 ; Patt. R'y Acc. Law, 51 *et seq* ; 65 Mo. 22 ; 50 Mo. 461 ; 60 Mo. 475 ; 36 Md. 366 ; 33 Md. 542 ; 46 N. Y. Sup'r (14 J. & S.) 473 ; 65 Texas, 443 ; 39 Md. 574 ; 67 Ala. 533 ; Ia. 688 ; 131 U. S. 551 (L. Ed. 35, 270); Grand Trunk R. Co. *v.* Ives, decided Apl. 4, 1892 ; S. C. U. S.   See Advance Sheet No. 6, p. 232.   L. Ed. May, 1892 ; 2 Woods R'y Law, § 230 and notes.   Beach on Contrib. Neg., §§ 50, 54, 187.

VI.—*Although plaintiff's intestate may have been guilty of negligence in using defendant's railway tracks as a foot-path for his own convenience elsewhere than at a lawful crossing, and received the fatal injuries complained of while so doing, yet, if the defendant had notice of the dangerous exposure of deceased, and, after having such notice, the defendant did not exercise ordinary care and diligence to prevent the injury, then the defendant is liable.*—28 W. Va. 732 ; 35 W. Va. 389 ; Patt. R'y Acc. Law, 51 *et seq.*

VII.—*Though the plaintiff's intestate may have been guilty of negligence in using defendant's railway track as a foot-path for his own convenience, elsewhere than at a lawful crossing, and received the fatal injuries complained of while so doing ; yet, if the defendant had notice of the dangerous exposure of deceased, and he was then and there apparently insensible to the danger from the approaching locomotive, and the defendant, after having such notice, failed to use ordinary care and diligence to avoid the injury, and but for such failure upon the part of defendant to use such ordinary care and diligence to avoid such injury, such injury would not have occurred, then the defendant is liable.*—28 W. Va. 732 ; 14 S. E. Rep. 465 ; 39 Md. 574 ; 67 Ala. 533.

VIII.—*A railway company is bound to keep a reasonable lookout for trespassers upon its tracks, and is bound to exercise*

*such care as the circumstances require to prevent injury to them.*—36 W. Va. (14 S. E. Rep. 465) ; 36 Md. 366.

IX.—*A railway company is bound to keep a reasonable lookout for trespassers upon its track, and is bound to use ordinary care and diligence to avoid injury to them.*—36 W. Va. (14 S. E. Rep. 465).

X.—*The fact, that pedestrians are accustomed to travel on a railroad at a particular place, makes it the duty of the railway company owning and using such railway to exercise greater caution and prudence in the operation of its road at that place, and to that end, to keep a reasonable lookout for pedestrians on its railway track at such place, and to use ordinary care and diligence to avoid injuring them.*—30 W. Va. 228 ; 36 W. Va. (14 S. E. Rep. 465); Beach Cont. Neg. § 187, note.

XI.—*"Negligence and ordinary care" are correlative terms. Ordinary care depends on the circumstances of the particular case and is such care, as a person of ordinary prudence would under the circumstances have exercised.*—18 W. Va. 579 ; 27 W. Va. 285.

XII.—*Gross negligence is a relative term. It is to be understood as meaning a greater want of care than is implied by the term "ordinary negligence," but after all it means the absence of the care that was necessary under the circumstances.*—1 Otto 489 (L. Ed. 23, 374).

XIII.—*A willful injury is actionable; and so is an injury that could be avoided by the exercise of ordinary care.*—10 M. & W. 546 followed by the Supreme Court of the U. S. and nearly every court of last resort in the United States, and by West Virginia in Downey *v.* R'y Co., 28 W. Va. 732; Acc. Law, p. 51, *etc.*

SIMMS & ENSLOW and J. E. CHILTON for defendant in error cited 29 W. Va. 98 ; 34 W. Va. 514 ; 49 Ark. 257 ; 12 Am. and Eng. R. R. Cases 79 ; 142 Mass. 296 ; 101 Pa. St. 258 ; 8 Am. and Eng. R. R. Cases 544 ; 43 N. Y. 527 ; 31 Gratt. 812 ; 68 Ia. 602 ; 87 Pa. St. 405 ; 62 Md. 479 ; 30 Gratt. 602 ; 71 Ill. 500 ; 22 Fed. Rep. 609 ; 100 Mass. 208 ; 78 Ga. 694 ; 43 Minn. 503 ; 67 Mich. 87 ; 86 Ala. 484 ; 88 Ala. 472 ; Beach Cont. Negl. (2nd Ed. §§ 202, 203 ; 83 Va.

553; Wood R'y Law, § 1267; 2 Ror. 1027; 25 W. Va. 692; 33 W. Va. 717; 14 S. E. Rep. 13.

HOLT, JUDGE:

1. This is an action of trespass on the case, brought in the Circuit Court of Kanawha county in February, 1892, by Maggie Raines, administratrix, against the Chesapeake & Ohio Railway Company for negligently causing the death of her husband and intestate, John B. Raines, which suit resulted in a judgment for defendant, from which she has obtained this writ of error.

The declaration contains two counts, both good; and the demurrer of defendant was therefore properly overruled. The issue was joined on the plea of not guilty. A jury was impanelled and sworn, and having heard the evidence of plaintiff in full the court on motion of defendant struck out plaintiff's evidence; and the jury by direction of the court returned a verdict for defendant. The plaintiff excepted to the ruling of the court excluding her evidence and moved the court to set aside the verdict and grant her a new trial; but the court overruled the motion and gave judgment and certified the evidence, as required by our present statute. Code 1891, p. 834, c. 131. s. 9.

Seven witnesses were examined on behalf of plaintiff, none for defendant, and the facts are, in substance, as follows:

The town of Montgomery, where the accident happened, contains from one thousand five hundred to two thousand people; is about one mile long on each side of defendant's railway, where the company has a station, a yard for storing cars and five tracks running from the station west to the lower end of the town, with spaces between wide enough to put a footman out of danger, and a county road running along near by on either side—the one on the south side at a distance of about one hundred and fifty yards. The one on the north side of the tracks is quite close, and is the main street of the town, being about fifty feet from the track, where Raines was killed. The track is straight there, and the footman on it could be seen for a long distance by the train going east. No houses were near the

track where Raines was killed. Adjoining the town above and below are the coal valley, and coal mines; and for some fifteen years or more footmen have been accustomed to use the track and travel along it without objection, it being often thus used in dry weather as well as when it is muddy.

On September 25, 1891, about five o'clock in the evening, No. 2, the east-bound passenger mail train, with four or five cars being on schedule time and running at its usual speed—at about twenty miles per hour at that point—came in sight and hearing at the lower or west end of the town, blowing one prolonged whistle for the crossing, and one for the station. As it entered the railway yard at the west end, the steam was shut off, and it ran on at a speed of fifteen or twenty miles per hour by its previous momentum.

Raines, the decedent, was walking slowly on the main track in the railway yard about two hundred yards east of the lower or western limit of the town, and four hundred or five hundred yards west of the station, about six hundred yards above Morris creek bridge, two hundred yards above a crossing at the lower end of the town, with his back towards the coming train, and a paper in his hand, as though he were reading or looking at it. When the coming train got within twenty or thirty feet, or some other short distance, the engineer blew the alarm—four or five quick whistles—put on brakes and steam, reversed the engine, and at once did all he could to save him. "The engine checked considerably," but passed on about a length of the train before stopping but struck and killed Raines, who was walking in front towards the depot.

"The fact, that pedestrains are accustomed to travel on a railroad track at a particular place makes it the duty of the servants of the company to exercise greater caution and prudence in the operation of its road at that place." *Nuzum* v. *Railway Co.*, 30 W. Va. 228 (4 S. E. 242.) This point of law arose out of the following facts: The servants of a railway company having in charge one of its engines and trains running within the corporate limits of Wheeling, to and over a public wharf therein, failed or neglected to give notice, at least sixty rods before its approach to the

wharf, by ringing the bell or blowing the whistle of the locomotive for a sufficient time to give notice of its approach thereto. It was in fact what is called a "flying switch" of the freight train, which ran down and killed the deceased on the track. And the court in the same case further holds: "If such company permit a train of its cars to be moved at that place without having some of its servants in position to give warning of its approach and to control its movements, these facts are of themselves acts of negligence." *Id.* "A person using a railway track as a footpath for his own convenience elsewhere than at a lawful crossing, and is injured while so doing, can not recover damages of the railway company unless it be guilty of wanton or gross negligence." *Spicer* v. *Railway Co.*, 34 W. Va. 514 (12 S. E. Rep. 553).

A railway company running its train is bound for the safety of such train to keep a reasonable lookout for trespassers on its track, and is bound to exercise such care, as the circumstances require, to prevent injury to such trespasser; but, having given the signal required by law, it has a right to presume that the trespasser, if apparently a capable person, will use his senses and seasonably remove himself from danger—that he can and will protect himself—so it need not diminish its lawful speed, and if the employes of the company omit no duty after becoming aware of his peril the company will not be responsible for a resulting injury ; but if the employes know him to be deaf or helplessly drunk or otherwise specially in danger, or if the person be a child too young to appreciate or avoid the danger, if they then neglect to give a reasonable warning, and keep on and inflict damage, the company will be responsible for an injury to such trespasser if it be guilty of willful or wanton or gross negligence. See *Spicer* v. *Railway Co.*, 34 W. Va. 514 (12 S. E. Rep. 553;) Bish. Non-Cont. Law, § 1037 ; *Railroad Co.* v. *Sherman*, 30 Gratt. 602–629; *Railroad Co.* v. *Harman's Adm'r*, 83 Va. 554 (8 S. E. Rep. 251) citing with approval 2 Wood, Ry. Law, 1267. See 2 Wood, R. R. Minor's Ed. 1894) § 320.

Trespassers on railroad tracks are of various kinds differing in the character of the trespasser, as one having his

full senses, one deaf or blind; differing in intent, as intentional or accidental; differing in place or in time or in other material circumstances, as being at a remote place where the trespass is not to be anticipated, or in cities or towns or at other thronged places, where they occur as of course, sometimes under allurements which the road itself has held out, or with its silence, amounting to a *quasi* consent, if the trespasser is willing to take the risks, but creating no right in the public to so use it, and creating thereby no obligation of special care or protection other than what the special circumstances may require.

It has long been settled as a qualification of the general rule making contributory negligence a bar in defence, that the contributory negligence of the party injured will not defeat the action, if it appear, that the defendant might by the exercise of reasonable care and prudence on his part have avoided injuring the plaintiff, notwithstanding the plaintiff's own contributory negligence; and, as a corallary, the same doctrine has been applied in cases of trespass. Both are but applications of the common-law doctrine, that every one must so conduct himself and so use his own, as not to injure another. Hence, "if those running a train discover a trespasser in danger, they must use all reasonable care and all reasonable exertions, to avoid inflicting injury and to avert from him the impending harm, or the road will be responsible for whatever injury follows." See Bish. Non-Cont. Law, § 1036, and cases cited.

In *Butterfield* v. *Forrester* (1809) 11 East side p. 60, Lord Ellenborough, C. J., says, delivering the opinion : "A party is not to cast himself upon an obstruction, which has been made by the fault of another, and avail himself of it, if he do not himself use common and ordinary caution to be in the right. In cases of persons riding upon what is considered to be the wrong side of the road, that would not authorize another purposely to ride up against them. One person being in fault will not dispense with another's using ordinary care for himself"—which is a statement of the rule by giving an illustration, and impliedly of the principal which underlies it.

The locomotive-engineer sounded the whistle for the

crossing just at the lower end of the town, and for the station in the town about one hundred and fifty yards below where Raines was killed. The train was on schedule-time running on the main track at the usual speed. Whether the engineer saw Raines on the track or not there is no direct evidence; but as this case is presented, we may presume that in such a place, the engineer and fireman being on the lookout for the safety of the train, if not for his safety, did see him, for the track was straight for three fourths of a mile. To all appearances he was an adult man capable of using his senses, and they had a right to suppose that he would in proper time get off the track out of danger—that he would reasonably step aside—so that they are not called upon to and need not stop the train or diminish its speed. This seems to me to be the plain dictate of common sense. I do not see what other fair rule could be adopted; and it is supported by all the authorities without exception, as far as I have been able to examine them.

That Raines had at the same time a paper in his hand looking at it, or reading it; holding it in front of him, was not likely to be noticed by the engineer, or, if noticed, was of no special significance; and, when they came near enough to see that the man might not be aware of his danger, then they did all that could be done to notify and alarm him, and to stop the train, but to no purpose; and this might readily happen under such circumstances without any want of proper care on their part. Witnesses at some distance from the track speak of the quickly repeated alarm whistle being blown when the train was within a distance of twenty or thirty feet, the air brakes being put on, and the engine reversed, and the "engine considerably checked."

There is in every case a preliminary question for the judge to determine, and that is, assuming the truth of the testimony and all the inferences that can be fairly drawn from it, would the jury as reasonable men be justified in finding a verdict for the party on whom rests the burden of proof? Would the verdict be against the law? That is, would a verdict for plaintiff be against the law of the case on the facts proved? Would the verdict be wholly without proof of some essential fact? Or is the evidence plainly

insufficent to warrant the finding of a verdict for the plaintiff ?

There are certain physical facts, which are to my mind conclusive that the statement, that Raines was only twenty or thirty feet ahead of the train, when the engineer commenced to blow the alarm whistle and stop the train, is only a mere conjecture, meaning only that the distance was very short.

Five witnesses saw it. · The first one was three hundred yards away. The train could go twenty feet while the sound of the whistle was reaching him. They whistled three or four times:

Witness No. 2 on this point was about one hundred yards away. He saw the train running at its usual speed at that place—fifteen or twenty miles an hour—with four or five cars. When within twenty feet of Raines the engineer sounded the alarm whistle four or five times, put on the brakes, reversed the engine, and checked it considerably before it struck the man. The engineer did all he could to save him, but Raines was too close. The train ran on sixty five steps—one hundred and ninety five feet—beyond the place where Raines was struck before it stopped. He blew the whistle, turned on the air-brakes, and reversed the engine before it struck him, and then went sixty five steps.

Witness No. 3 was one hundred and twenty feet away. Heard the whistle. Turned his head immediately, and looked towards the train, and saw the man going over about four times. He gives no distance except that measured by the time of turning his head after he heard the whistle. In all likelihood the air-brake was put on and the engine reversed first.

Witness No. 4 gives no distance except that it was short —so short that Raines could not escape. This witness was but a short distance away. She is the one who speaks of Raines having a paper in his hand, but refused absolutely to say whether it was large or small.

Witness No. 5 was about one hundred yards away. Heard the whistle blow three or four times in quick succession, which attracted his attention to it. Raines was a very short distance from the train ; can not make it more defi-

nite. He saw nothing in his hand. His head was down. He looked something like a drunken man. He saw him walking on the track after the train whistled.

All this means that he was too close for the train to be stopped before it would strike him. As to anything like the accurate distance, this evidence, as a whole, leaves it uncertain. The train was going fifty or sixty feet in three seconds. It is not at all probable that Raines was only twenty feet ahead of the train, when they commenced applying the air-brakes, reversing the engine, and blowing the alarm. Raines had lived at that place at least three years. The train was on schedule time, running through the train yard at its usual rate of speed. There were safe walking ways on either side. He had but to step right or left to be out of danger. He was possessed of sight and hearing;—nothing unusual in his appearance. The prolonged whistle had sounded twice a short distance below—once for a crossing, and once for the depot. The engineer had a right to presume that he would seasonably step out of danger, and not until he got quite close did he become aware that the man was insensible of his peril. Then he did all he could to save him, but to no purpose; he was too close.

I know of no rule, and can find no case, making it the duty of the engineer, under such circumstances, not to approach a man walking on the track nearer than the distance within which the train can be stopped—say two hundred feet in this case. See *Railroad Co.* v. *Miller*, 25 Mich. 279 ; 2 Wood, R. R, (Minor's Ed. 1894) § 320, p. 1465. Under such circumstances, to exact of the engineer nice estimates of distance, based on the supposition that the man walking on the track may not be sensible of his danger, and will not step off, seems to me to be unreasonable.

The action of the court in striking out the evidence has been held to be an indirect mode of directing the jury to return a verdict for the defendant, the plaintiff not being willing to suffer a nonsuit. Here it was accompained by an express direction to return a verdict for defendant. I can discover but the one question involved. Does the evidence tend, in any fairly appreciable degree, to make out plaintiff's case ? I am of opinion that it does not; that

the accident was what is termed in law an "inevitable acci-
dent;" and, although the question of negligence is gen-
erally one of fact for the jury, yet, "when the facts are such
that all reasonable men must draw the same conclusion
from them, then it becomes a question of law for the court."
See *Railway Co.* v. *Ives* (U. S.; Oct. Term, 1891) 12 Sup.
Ct. 679, and cases cited. There is no room for two fair-
minded, reasonable opinions about it. See *Corcoran* v. *Rail-
way Co.*, 105 Mo. 399 (16 S. W. Rep. 411). The evidence in
this case is plainly insufficient to warrant the finding of a
verdict for the plaintiff, and the court could not have hesi-
tated to set it aside. See *Grayson's Case*, 6 Gratt. 721–724.
Judgment affirmed.

### ON REHEARING.

The evidence in this case explained and qualified, as it
must be, by certain well-known physical laws shows to a
high degree of probability at least, that the engineer com-
menced applying the air-brakes, reversing the engine, and
blowing the alarm before the train reached a point twenty or
thirty feet distant from the footman on the track. As to
anything like the accurate distance, this evidence, as a whole,
leaves it uncertain; but it does show clearly, that the train
was then much too close to be stopped before striking him;
but I take the distance to have been twenty or thirty feet,
for they are the figures used by some of the witnesses. So,
also, I take the fact to be that footmen at that place were ac-
customed with the knowledge of defendant to use the track
as a walkway; and that the rule of law (*pro hac vice*) is that
in such case it is the duty of the engineer or fireman to
keep on the lookout along the track, and that the engineer
was on the lookout and did see decedent walking on the
track towards the depot for a long distance.

John B. Raines, the decedent, had lived in the town about
three years. About 5 o'clock in the evening of the 25th
of September, 1891, he was walking eastward on the track,
using it as a footpath for his own convenience, as many per-
sons are in the habit of using it. He had in his hand a
piece of paper, looking at it now and then. The size of
the paper does not appear. He was in fact an adult, in the
full possession of all his faculties, or so on this occasion he

appeared to be.   Defendant's east-bound passenger-train con-
sisting of locomotive, tender and five cars, running on sched-
ule time at its usual rate of speed—of about twenty miles
an hour—at that place, came in sight and hearing at the
lower end of the town, and whistled for a crossing at that
point, heard by the witnesses.   Again, about one hundred
and fifty yards from decedent, it gave a prolonged whistle
for the depot.   The steam was turned off for it to run by
its own momentum to the station.   There was nothing at
that time to indicate to the engineer, that decedant was un-
aware of the approaching train and would not in due time
step off the track.   This the engineer had a right to pre-
sume he would do.   But he still making no motion to get
off, the engineer sounded the alarm, put on the air-brakes
and reversed the engine—did all that could be then done to
save him; but he was only twenty or thirty feet ahead, and,
although the train was perceptibly checked, Raines was
struck and instantly killed.

Common sense and common justice applied to the prac-
tical affairs of the managing of railroads and the running of
trains require, that there must be left to engineers some
margin for forming their judgment, which may still be dis-
creet, and some latitude of conduct which may in either
event be held to be prudent.   He will not, on pain of con-
viction of negligence in a matter involving life and limb, be
held to make, on the spur of the moment, a nicely accurate
estimate of the probability that one walking on the track
is insensible of his danger, from the mere fact that he is
on the track within a distance within which the train can
not be stopped; for common observation shows that per-
sons fully aware of the approach of the train cross the
track, or fail to step off, although the train may be within
such distance; for one second or a half second in time, and
two steps or three in distance, will put him out of dan-
ger.

In this case the footman was a grown man, apparently in
the use of his faculties, physical and mental.   He had a
signal of danger beneath his feet.   The train was on time.
A signal had been sounded half a mile away.   The depot
was in plain view in front.   A prolonged signal for the

depot had just been sounded five hundred feet in his rear. He is presumed to look back as well as forward, and that he will act on the instinct of self-preservation and step out of the way.    Under such circumstances, negligence of the engineer can not be reasonably inferred.    It was a case of unavoidable accident, such as no degree of foresight and care on the part of the engineer could reasonably be expected to anticipate in time to avoid.    How was he to know that the footman was unconscious of his approach ?    There was nothing to indicate it.    On the contrary he presumed, as he had a right to do, that the footman would step off in time. . Nor was there anything as yet to require the engineer to change his opinion, and act thereon in time to stop the train before collision.    These facts, as I read the evidence, are not doubtful, nor are the inferences of fact to be drawn from them.

I concur in the opinion of the Circuit Court that they do not tend in any fairly appreciable decree to convict the engineer of want of ordinary care.    The case therefore passed from the domain of fact, in the sense of à thing to be found by the jury, into the domain of law, to be determined by the court.    A verdict for the plaintiff would have been against law; that is, against the law of the case upon the facts proved.    Therefore the Circuit Court did not err in refusing to submit the case to the jury.

---

DENT, JUDGE (*dissenting*) :

The facts in this case are as follows, to wit :    The deceased was a trespasser on the track of the defendant within the corporate limits of the town of Montgomery (one thousand five hundred population) at a place the people were in the habit of using as a walkway.    It was about 5 o'clock P. M.—the time for the regular passenger train.    An engine had but a few moments before passed over the track.    Deceased was walking with his head down, apparently absorbed in studying some paper.    He was going east, with his back to the approaching train.    The train whistled for the station from one hundred to two hundred yards from deceased.    The

engineer, if looking, could have seen deceased from the time he sounded the-whistle for the station until the engine struck him, as the track was straight, the view unobstructed, and it was broad daylight. The bell was not rung, nor the whistle sounded, from not less than one hundred yards away until the engine was within less than thirty feet of deceased and about to strike him—too late for him to step out of danger, as the train was going at the rate of twenty miles per hour.

Did the engineer see deceased? It was his duty to see him. Others saw him, who were not bound to see him and not occupying as good a position to see him as the engineer. The law will presume that the engineer discharged the duty to and did see him, unless the contrary appear. At least the jury in the light of the evidence from the facts and circumstances would have the right to infer, that he being a man of ordinary intelligence attentive to his duties did see him. Such being the case, what was his duty—to wait until he was too late, or sound the alarm whistle and ring the bell in time to arouse the deceased, and enable him to avoid the threatened danger?

In 2 Ror. R. R. 1027, the law is stated to be as follows, to wit: "The servants in charge of a train have a right to presume that a man on the track is of sound mind and good hearing, and will get off in time to avoid danger,  * * *  and therefore, the train is not obliged to stop, but is only bound to ordinary care of warning by whistling and bell ringing, if the person is seen by persons in charge of it, which is due to all persons on general principles. This done in time for avoiding the danger, the company is not liable."

In *Finlayson* v. *Railroad Co.*, 1 Dill. 579 (Fed. Cas. No. 4793) the law is stated to be: "A railroad company whose train is approaching a man walking lengthwise upon its track must ring its bell and sound its whistle in time to enable him to *get off the track; otherwise it is liable.*" (The italics are mine.) "If they being aware of his presence delayed to ring the bell and sound the whistle until he could not have stepped aside and saved himself, in that case there was negligence on the part of these employes, for

which the railroad company is liable." "If they rang the bell and blew the whistle in such time as any reasonable man of good hearing could have heard it, and got off instantly, then the defendants are not liable." "This man had no right to be there, and he should have not been there. It does not follow, however, because he was there unlawfully, that the other party could run him down."

Numerous, nay all the cases examined by me present the law in the same way, even including the fourth syllabus in this case, which is in these words, to wit : (4 "If an apparently capable person, and one apparently in the possession of his faculties, is seen walking on a railroad track, the servants of the company running the train having given such signals as may be required, have a right to act on the presumption that such person will step aside in time to secure himself from danger."

What signals were required ? The court does not state, but presumes they were given. The law quoted says the bell must be rung and whistle sounded in time to warn the deceased of his danger, and enable him to step aside to avoid it. That this was not done in the case before us, the evidence plainly establishes; but the servants of the defendant having the deceased in plain view for over one hundred yards bore down upon him until it was too late, and then, as a wild animal sure of its prey, rushed upon him with the whistle sounding, as if to make his death the more horrible when it was too late to save him. My conclusion supported by reason, justice and authority is, that it was the duty of the engineer under the circumstances on discovering the deceased on the track one hundred yards away to begin sounding the alarm whistle and ringing the bell, and to continue the same, until the attention of the deceased was attracted or he was struck. In not doing so he was guilty of wanton sacrifice of human life, amounting to gross negligence. He disregarded the ordinary rule of all railroad companies : "In all cases of doubt, take the side of safety."

It may be a hardship on the company to impose damages on them in such cases; but there is no other way to reach its negligent employes, and enforce a due regard for the law and the lives of citizens, except through the company.

The first, the highest, and most important duty of all law is the protection of human life from unnecessary destruction; and he who destroys it should be prepared and required to show that he used all available and lawful means at his command, and after doing so, the destruction was unavoidable.

While the law regards a railroad track to be the private property of the company, and the use thereof as dangerous and perilous, yet it lies open to the commons, and affords a dry, smooth, even, level, and convenient walkway for pedestrians, especially in populous communities and is therefore a source of great temptation to the public. The law, in permitting railroad companies to rush their trains through the country at a great rate of speed, requires them to adopt the necessary means to warn trespassers out of their way in time for them to escape death. The ringing of the bell and sounding of the whistle are not matters of much exertion; neither do they in any way interfere with or impede the running of trains.

In this case there is a powerful and wealthy corporation on the one hand with numerous and influential friends, and a bereaved widow and fatherless children on the other, and my deep sympathies for the appeals of the helpless and needy may cause me to hold the scales of justice unequally between them; but it is my sincere judgment, that the evidence should not only have been submitted to the jury, but, as it now stands, is plainly sufficient to warrant a verdict in favor of the plaintiff. My convictions may appear unreasonable to others; yet, while I highly esteem the more mature judgment of my associates, an approving conscience can be the only arbiter that a judicial officer can recognize in discharging his individual duties.